# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEYMAN H. COX II,<br><br>　　　　　　　　　　Plaintiff,<br>　vs.<br><br>PAUL REVERE LIFE INSURANCE COMPANY, UNUMPROVIDENT CORPORATION, and DOES 1 through 10, inclusive,<br><br>　　　　　　　　　　Defendants. | CASE NO. 08cv1353-LAB (WMC)<br><br>**ORDER RE: MOTION FOR A NEW TRIAL** |

　　　This case was tried to a jury verdict on January 11-14 of this year. The jury found for Paul Revere. Specifically, it found that Paul Revere did not breach a disability insurance contract with Mr. Cox by attributing his disability — failing eyesight — to an illness rather than an accident, which entitled Mr. Cox to a smaller payout under the insurance contract. On February 25, 2011, Mr. Cox filed a motion for a new trial. The basis for the motion is Mr. Cox's contention that the Court provided an erroneous answer to a question from the jury after it began deliberating. The question went to *the* critical issue in the case, and the Court gave it substantial consideration and consulted extensively with counsel before answering it.

　　　The jury's question was whether two statements of Mr. Cox's expert, Dr. Paul Tornambe, on direct examination were *admitted into evidence*. The first statement was that

tears in the vitreous caused by trauma are larger than tears that occur naturally. The second statement was that Mr. Cox had a large tear in the vitreous of his left eye. Dr. Tornambe made the first statement in the context of a general tutorial about the physiology of the eye, and at the time counsel for Paul Revere did not object. He made the second statement when, later in his testimony, he was asked if he'd formed an opinion as to the cause of the retinal detachment in Mr. Cox's left eye. This time, counsel for Paul Revere did object to Dr. Tornambe's statement and the Court sustained the objection. After a lengthy colloquy with counsel for Mr. Cox and Paul Revere, the Court answered the jury's question as to both statements "No."

The Court heard oral argument on the motion for a new trial on May 31, 2011 and denied it. It explained the bases for its ruling at the hearing, and it issues this Order to confirm the ruling and the rationale for it.

**I.    Dr. Tornambe's Stricken Testimony**

On direct examination, counsel for Mr. Cox asked Dr. Tornambe if he had an opinion as to the cause of the retinal detachment in Mr. Cox's left eye. Dr. Tornambe responded, "The snowmobile accident." (Jan. 12 Tr. at 32:6–8.) Counsel then asked what the basis for that opinion was. Dr. Tornambe responded,

> I think there are three major areas.
>
> Number one is the close relationship of the trauma and the development of the floaters and the retinal detachment. If you just look at the odds, the incidence of retinal detachment, as I said, five to ten per hundred thousand. So the chances of that happening serendipitously on the same day or the day after a trauma which does involve the head and say that that's just serendipity, it just happened, doesn't make — isn't logical to me.
>
> The second is the finding of the large posterior tear. The tear that he had . . .

(*Id.* at 32:9–20.) At this point counsel for Paul Revere objected on the ground that Dr. Tornambe did not offer this basis for his opinion in his deposition. Indeed, when Dr. Tornambe was asked during his deposition why he concluded that Mr. Cox's retinal detachment was caused by a snowmobiling spill as opposed to some other, natural cause, he responded, "*Just* the temporal relationship." (Tornambe Dep. at 42:6–10 (emphasis

added).)  He also indicated that none of the physical attributes of a traumatic retinal detachment — which would surely include a large posterior tear — were noted in the report of the first ophthalmologist to treat Mr. Cox.  (*Id.* at 40:23–41:13.)

In addition, neither of Dr. Tornambe's expert reports singled out the size of Mr. Cox's vitreous tear as a basis for his conclusion that his retinal detachment was caused by trauma, at least in clear and specific terms.  His first report, prepared on August 12, 2009, merely noted, "The distortion OS is secondary to the detachment sustained within a few days of the snow mobile trip and to a high degree of medical probability, was caused by the falls taken during the snowmobile ride."  (Kojima Decl., Ex. C at C2.)  His second report, prepared after he was deposed, went into slightly more detail:

> After reviewing these documents I have come to the conclusion that beyond reasonable medical probability, the snowmobile accident was the major contributing factor for the retinal detachment Mr. Cox sustained in the left eye.  I base this opinion on a thirty-two year experience treating thousands of patients with retinal detachments, the type of injury sustained and the proximity of the injury to the development of the retinal detachment . . . .
>
> The 'go and stop' forces sustained during this snowmobile accident are sufficient to result in a tear and a retinal detachment.  The symptoms his wife vividly relates on the car ride home the day of the accident and on the plane ride home the day following the accident are consistent with a torn retina and an early retinal detachment.  The proximity of the accident and his symptoms make it to a high degree of medical probability that the accident played a direct role in the development of the retinal detachment.

(Kojima Decl., Ex. D at D1–2.)

After hearing Paul Revere's objection to Dr. Tornambe's testimony, the Court considered Dr. Tornambe's deposition and his two reports and sustained the objection.[1]

---

[1] There was little argument on the objection at the time, but counsel for Mr. Cox did insist that Dr. Tornambe was not asked about the basis for his opinion during his deposition. (Jan. 12 Tr. at 33:2–3 ("I'm very sure that this question was not asked in the way that we're talking about, your honor."); Jan. 12 Tr. at 34:7–8 ("I can't cite it in the deposition because it wasn't asked . . . .").)  Dr. Tornambe *was*, in fact, in no uncertain terms, asked to explain the bases for his opinions during his deposition.  "Q: Would you explain why it is that you concluded that the retinal detachment was caused by the snowmobiling as opposed to some other cause, such as myopia?  A: Just the temporal relationship."  (Tornambe Dep. at 42:6–10.)

(Jan 12 Tr. at 35:7–9.)

There is no getting around the fact that when Dr. Tornambe was asked during his deposition why he concluded Mr. Cox's retinal tear was caused by trauma, he said, "*Just* the temporal relationship." His first expert report made no mention of the size of the vitreous tear, and his second report made only a cryptic reference to "the type of injury sustained" as a basis for his conclusion that Mr. Cox's snowmobiling spills caused his retinal detachment.[2] This could mean anything, really. Dr. Tornambe testified, for example, that a snowmobile spill, or even sudden stops on a snowmobile, can cause a retinal tear, without any reference whatsoever to the nature of that tear. (Jan. 12 Tr. at 36:14–25.) By saying "the type of injury sustained" supports the conclusion that "the snowmobile accident was the major contributing factor for the retinal detachment," perhaps Dr. Tornambe was making only that point.

The Court also rejects Mr. Cox's argument that when Dr. Tornambe offered the excluded testimony on cross-examination, counsel for Paul Revere didn't object to it. That's inaccurate. Here is how the exchange went:

> Q: Now, assuming that Mr. Cox had not taken any snowmobile spills and he had presented to your office either for examination or for treatment with complaints of feathers or specks in his eyes, would you entertain a possibility that the detachment had been spontaneous?
>
> A: If there was no history — if I said "Is there any history of trauma?" and he said "No," it would be consistent with a nontraumatic detachment with the exception, as I told you, that the size and the posterior location of the tear is unusual.

---

[2] At the recent hearing, counsel for Mr. Cox alluded to discussions between counsel about Dr. Tornambe sitting for a second deposition after he submitted his second report. The implication, as the Court understood it, was that counsel for Mr. Cox fulfilled his duty to supplement Dr. Tornambe's *first* report under Fed. R. Civ. P. 26(e)(2) by submitting his *second* report, and that Paul Revere strategically sat on its hands because it got favorable answers from Dr. Tornambe during his deposition. The Court rejects Mr. Cox's contention for two reasons. The first is that the second report, even if regarded as a supplemental disclosure, did not adequately disclose the opinion at issue under Fed. R. Civ. P. 26(a)(2)(B)(i). (*See* Jan. 14 Tr. at 110:10–14.) The second report contained only a vague supplemental disclosure that masked a critical opinion and was plainly inadequate to alert Paul Revere to the specifics of the opinion, or even to the gist of it  The second problem is that counsel for Mr. Cox never raised this issue prior to or during trial. If he believed Paul Revere was stubbornly refusing to pursue a supplemental disclosure in order to preserve an objection to one of Dr. Tornambe's opinions, he could have raised that with the Court at any time.

| | | |
|---|---|---|
| Q: | | Doctor, we've already established that that testimony is not important here. |
| A: | | Okay. I was just trying to answer your question. |
| Q: | | Thank you. I appreciate that. |

(*Id.* at 55:23–56:6.) If nothing else, the manner in which counsel for Paul Revere interrupted Dr. Tornambe here was an objection. More to the point, it was an objection that referenced his earlier objection, which the Court sustained, to Dr. Tornambe's testimony on direct examination that the size of Mr. Cox's vitreous tear was suggestive of trauma.

The bottom line is this: Rule 26 requires that an expert's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). It should "set forth the substance of the direct examination." The Advisory Committee notes even suggest that a proper expert report should minimize the need for a deposition. *See also Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) ("The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources."). These standards are not to be taken lightly. Under the Federal Rules, "an evasive or incomplete disclosure . . . must be treated as a failure to disclose . . . ." Fed. R. Civ. P. 37(a)(4). And more importantly, what isn't disclosed isn't admissible. Fed. R. Civ. P. 37(c)(1). *See also Goodman v. Staples*, No. 10-15021, 2011 WL 1651246 at *9 (9th Cir. May 3, 2011) ("Rules 37 'gives teeth' to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed."). With these standards in mind, it is inconceivable that Dr. Tornambe's two reports adequately disclosed his apparent opinion that the size of Mr. Cox's vitreous tear suggests his retinal detachment was caused by trauma rather than natural factors.

Counsel for Mr. Cox even *concedes* that the testimony of Dr. Tornambe at issue was not included in his reports, but he retreats to the position, which the Court has rejected, that

Dr. Tornambe was not asked for that testimony during his deposition:

> Court: You can't make a claim affirmatively that Dr. Tornambe expressed the opinion that this was injury rather than sickness based on an examination and the tearing of the eyes and he said that in advance. It is nowhere in those reports. It wasn't in the deposition either. It is no answer to say that, well, he wasn't asked. He is your witness. You have an affirmative obligation to give the other side his opinions that he is going to offer. It wasn't in the report. It was properly excluded . . . .
>
> Mr. Horrow: I understand that, your honor. I have to make my record with respect to Dr. Tornambe. He was not asked that question in his deposition. And had he been asked that question in his deposition, he would have offered that testimony.
>
> Court: You acknowledge that he didn't put it in his report either?
>
> Mr. Horrow: I acknowledge that . . . .

(Jan. 14 Tr. at 101:4–25.)

With all of this in mind, the Court stands by its exclusion of Dr. Tornambe's testimony that the size of Mr. Cox's vitreous tear supports his conclusion that the snowmobile accident caused Mr. Cox's retinal detachment. It was appropriate, therefore, to answer "No" to the jury's question whether Dr. Tornambe's statement that Mr. Cox had a large vitreous tear in his left eye was admitted evidence.[3] Counsel for Mr. Cox, before making his record at trial, as much as agreed with this:

> Mr. Horrow: I believe the answer to question number one should be "Yes" because there is actual testimony from Dr. Tornambe

---

[3] It bears emphasizing that Dr. Tornambe said nothing about the size of Mr. Cox's vitreous tear outside of his stricken testimony, in spite of his counsel's wishful recollection that he did. (*See* Jan. 14 Tr. at 103:8–12; 104:4–6.) Thus, it's a losing argument that the Court struck an *opinion* on causation that was not properly disclosed under Rule 26, whereas the jury's question went to the admissibility of a *statement* on the particulars of Mr. Cox's retinal detachment. That statement was made as a prelude to, and was inseparable from, the excluded opinion. The stringent disclosure requirements of Rule 26(a)(2)(B)(i) would be meaningless if the minor premises of an excluded expert opinion were themselves admissible as freestanding facts, for the jury to then assemble into precisely the opinion that was properly excluded. It is true that the jury asked only about the admissibility of Dr. Tornambe's *statement* that Mr. Cox had large vitreous tears in his left eye. (Kojima Decl., Ex. G.) But it was clear to the Court that, taken in context, the jury's question implicated precisely the *opinion* of Dr. Tornambe that the Court instructed it not to consider. (*See* Jan. 14 Tr. at 98:6–15 ("In the context of this note, although it can be said that, well, this is really just asking about what he saw when he examined the eye, I think it is so close to what was excluded that my own judgment tells me someone remembers this and is forgetting that the Court had admonished the jury to disregard this and not let that play part in the deliberations."); 103:1–2; and 103:13–24.)

answering that question specifically on the record.

With respect to number two, that would be a "No" and I would understand that.

(*Id.* at 107:9–13.) The Court finds no error in its answer of "No" with respect to Dr. Tornambe's second statement, and therefore no basis for a new trial.

A final point: Mr. Cox now takes the position that the size of his vitreous tear *was* in evidence because it was mentioned in the report of Dr. Smith, the retinal surgeon who saw him after he suffered the detachment. That is true as far as Dr. Smith's report goes. Dr. Smith's report observed:

> There is a rhegmatogenous retinal detachment extending from approximately five o'clock clockwise around to the nine o'clock position, with a very large tear with a radial component which is quite posteriorly positioned.

(Horrow Decl., Ex. D.) Here is the problem with that argument: the jury's question asked whether two statements of *Dr. Tornambe* were admitted into evidence. (Kojima Decl, Ex. G.) It did not ask whether the mere fact that Mr. Cox had a large vitreous tear was admitted into evidence. That would have been a very different question that required a very different answer because, as Mr. Cox correctly argues, this fact was indicated in the report of Dr. Smith.

**II.   Dr. Tornambe's Tutorial**

The Court now turns to the jury's question, which it also answered "No," regarding the admissibility of Dr. Tornambe's statement that tears in the vitreous caused by trauma are particularly large.

Shortly after Dr. Tornambe took the stand and recited his credentials, he was asked by counsel for Mr. Cox to explain "how the eye works and where the retina is." (Jan. 12 Tr. at 16:16–17.) Dr. Tornambe stood down from the witness stand and, with a marker and an easel pad, did that. In the course of this tutorial he said:

> Now, if a tear occurs gently, usually the tears will be little horseshoes. That's the way that they happen. And you can get a bunch of them. I did a fellow last week that had 14 tears between there and there (indicating), a bunch of little ones. It just happens spontaneously.

>With trauma, because the retina doesn't have a chance to recoil, the tears frequently are bigger. And they tend to extend more posteriorly, so they tend to be larger and go back further. Okay? Not always. Not a hundred percent of cases. But when you see a big posterior tear, that is more commonly associated with a traumatic event.

(*Id.* at 24:1–11.) Counsel for Paul Revere did not object to this testimony, which the Court and counsel for Paul Revere recognized when considering how to respond to the jury's note. (Jan. 14 Tr. at 105:5; 95:5–6.) But it was also unclear to counsel for Paul Revere, at the time, that an objection was necessary, because Dr. Tornambe hadn't yet offered his excluded opinion, and indeed, the opinion wasn't foreseeable based on his expert reports and deposition testimony. An objection is timely so long as it's made "as soon as the opponent knows, or should know, that the objection is applicable." *Jerden v. Amstutz*, 430 F.3d 1231, 1236–37 (9th Cir. 2005). When counsel for Paul Revere objected to Dr. Tornambe's opinion that the size of Mr. Cox's vitreous tear was indicative of trauma, that was conceivably a permissible, albeit belated, objection to Dr. Tornambe's tutorial that, generally speaking, large tears are indicative of trauma. (Jan. 14 Tr. at 93:25–94:6. ("The objection came a little bit late. And I think it was because maybe Mr. Maguire didn't anticipate that he was going to offer a different opinion.").)[4]

Mr. Cox takes the position now that Dr. Tornambe's statement in his tutorial about the size of vitreous tears was a general medical statement, and therefore shouldn't have been excluded from evidence. (*Id.* at 99:5–9; 100:1–14; 102:13–15.) This begs the question, though, whether the statement has any relevance independent of Dr. Tornambe's excluded opinion. It is hard to see how it does. Perhaps Mr. Cox is hoping that the general medical

---

[4] The Court acknowledges now that its initial inclination was to admit the general tutorial of Dr. Tornambe because counsel for Paul Revere didn't object to it. (Jan. 14 Tr. at 102:16–22; 105:1–6.) But neither this inclination, nor Paul Revere's non-opposition *on the spot* to Dr. Tornambe's tutorial, are binding. The moment it became apparent to Paul Revere that Dr. Tornambe was attempting to offer an opinion he had not previously disclosed, it objected and the Court sustained the objection. It is not unfair to Mr. Cox that the Court ultimately applied this objection retroactively to Dr. Tornambe's tutorial, to make it clear to the jury that his opinion about the size of Mr. Cox's vitreous tear being indicative of trauma was not admitted into evidence. *See Home Indem. Co. v. Lane Powell Moss and Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995) ("[T]rial courts have broad discretion in making evidence rulings and handling late objections."). Anyway, he could not have cured the failure to disclose given the strictures of Rule 26(a) and 37(c).

statement about large vitreous tears being suggestive of trauma, coupled with the indication in Dr. Smith's report, which Dr. Tornambe reviewed, that the tear in Mr. Cox's vitreous was "very large," suffices to get the excluded opinion in, albeit indirectly.  It doesn't.  The physiology of the eye as it relates to a casual analysis of retinal detachments is not a matter of common knowledge and therefore necessitates expert testimony.  *Moody v. Maine Cent. R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987).  Mr. Cox cannot ask the jury to reach an expert opinion for itself after the Court has forbidden an expert from offering that very opinion, simply because the premises of the opinion can be found in isolation somewhere in the trial record.  Were it otherwise, every time a court sustains an objection to an expert's opinion on the ground that it was not properly disclosed, it would have to scour the entire trial record up until the time the objection was made of evidence that implicates the excluded opinion.

Because Dr. Tornambe's tutorial is meaningful only in relation to an excluded opinion, the Court sensibly excluded the general statement as well.  As it explained at the time:

> I agree more particularly with Mr. Maguire's other point that the only relevance that the statement about larger tears having most likely being or having the tendency to be connected with trauma. The only relevance to that would be in relation to some admissible opinion, and there is none here.  And there is a great probative danger to me to parse this and answer the one question "Yes," the second question "No."
>
> And the probative danger, I find, and likely the prejudice to the defense would be that the jury would misuse that information as an opinion rather than just part of a tutorial on the eye.  I agree wholeheartedly with the characterization that it was in that context that the statement about the size of the tear was made. And given that thereafter, there was an objection.  There was an exclusion of evidence relating to that forming a basis for finding that this tear resulted from injury rather than sickness.  It would be too tempting and too likely, in my judgment, that the jury would misuse that information for a prohibited purpose.
>
> The Court is going to answer this by sending a note back in that reads as follows: "The answer as to both statements is 'No.'"

(Jan. 14 Tr. at 110:15–111:10.)  The Court stands by that answer now.  Dr. Tornambe's opinion that the size of the tear in Mr. Cox's vitreous was indicative of trauma was properly excluded.  His earlier statement that large tears are indicative of trauma had no significance or probative value independent of that excluded opinion.

The record also establishes that, in lieu of simply answering "No," the Court

1  contemplated telling the jury that Dr. Tornambe's general medical statement was admitted
2  into evidence, but could only be considered within the context of his tutorial on the
3  physiology of the eye. (Jan. 14 Tr. at 94:11–15.) Counsel for Mr. Cox, afraid that this would
4  focus the jury on his failure to disclose Dr. Tornambe's opinion, objected to this approach
5  and insisted that if the Court was inclined to answer "No," it should leave it at that. (*Id.* at
6  99:16–24.)

7  "No" was the right answer to the jury's question. A final point: Mr. Cox now argues
8  that the Court should have either avoided answering the jury's question in the first place, or
9  else avoided providing a categorical "Yes" or "No" answer. Had the jury's question gone to
10 the weight or meaning of the evidence presented, Mr. Cox would have a point. *United States*
11 *v. Ayeni*, 374 F.3d 1313, 1320 (D.C. Cir. 2004) ("[W]here a jury's questions relate to a factual
12 matter, a substantive reply . . . risks interfering with the jury's exclusive responsibility for
13 resolving factual questions."). But the jury's question here whether *certain testimony was*
14 *admitted into evidence* was purely legal. It would have been wholly inappropriate for the
15 Court to leave the question alone by telling the jurors to rely on their own recollection. Also,
16 with all due respect to Mr. Cox, his argument isn't really that "Yes" and "No" answers to jury
17 questions are disfavored; it's that "No" was the wrong answer to the jury's question in this
18 case.[5] He obviously wouldn't take the position that "Yes" and "No" answers are disfavored
19 if the Court had answered "Yes."

20 **III.   Conclusion**

21 An erroneous jury instruction, and presumably an erroneous response to a jury's
22 question, can be grounds for a new trial. *Murphy v. City of Long Beach*, 914 F.2d 183, 187
23 (9th Cir. 1990). The Court does not find that its answer of "No" to the jury's question in this

---

[5] The case on which Mr. Cox relies here, *United States v. Walker*, is distinguishable anyway. The jury's question in that case was a hypothetical that invited the court to weigh in on a criminal defendant's guilt: "Our interpretation of Count I is that the defendant had to have the intent to steal and purloin the Sea Wind before leaving the Palmyra area. If we were to determine that the intent occurred at a later time on the trip to Hawaii, would that necessitate a not guilty verdict on Count I?" 575 F.2d 209, 213 (9th Cir. 1978). In that context, a court's hesitation to provide a "Yes" or "No" answer is perfectly understandable. Here, though, the statements of Dr. Tornambe either were or were not admitted into evidence, and the jury merely asked for the Court to clarify an earlier legal ruling.

1 case was erroneous.  To the contrary, the Court finds on review that it was the correct
2 answer.  If Mr. Cox wanted the jury to consider that the size of the tear in Mr. Cox's vitreous
3 was suggestive of trauma, that opinion should have been disclosed, in clear terms, in an
4 expert report provided to Paul Revere.  It was not.  That opinion, and the premises of that
5 opinion, were therefore properly excluded.  Mr. Cox's motion for a new trial is **DENIED**.[6]

**IT IS SO ORDERED**.

DATED:  June 8, 2011

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[6] For whatever it is worth, the Court has doubts that its answer to the jury's question cost Mr. Cox a favorable verdict, even if it were to credit Jeffrey Rogers' declaration, which is plainly inadmissible under Federal Rule of Evidence 606(b).  First, if the opinion had been properly disclosed, Paul Revere would have been prepared to cross-examine Dr. Tornambe on it, or to offer contradictory expert testimony, or to tailor its own expert's testimony to discount the opinion.  Second, the Rogers declaration suggests that if *both* statements of Dr. Tornambe had been admissible, the jury's vote would have favored Mr. Cox.  But counsel for Mr. Cox concedes that the Court reasonably excluded the second of Dr. Tornambe's statements. (Jan. 14 Tr. at 107:12–13.)  The Rogers declaration says nothing about where the jury would have stood had the Court answered "Yes" as to Dr. Tornambe's first statement and "No" as to the second.  Third, the jury was presented with another theory of causation — namely the temporal relationship between the snowmobiling spills and the retinal detachment — and rejected it.  In light of the jury's rejection of Mr. Cox's chief theory of causation, it is purely speculative to assert that the Court's "No" answer to the jury's question was a game changer.